**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION**

PHILADELPHIA INDEMNITY INSURANCE COMPANY,　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)　Case No. _____
　　　　　　　　　　　　　　　　　　　　　　　　　)
PAL'S GLASS SERVICE, INC.,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　Serve:　BD Registered Agent, Inc., Resident Agent　)
　　　　　　　301 N. Main, Suite 600　　　　　　　　)
　　　　　　　Wichita, Kansas 67202　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
BLU ROCK CONCRETE, LLC,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　Serve:　Tim Sinclair, Resident Agent　　　　　)
　　　　　　　301 N. St. Francis Street　　　　　　)
　　　　　　　Wichita, Kansas 67202　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
INTEGRATED GROUP HOLDINGS, INC.,　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　Serve:　BD Registered Agent, Inc., Resident Agent　)
　　　　　　　301 N. Main, Suite 600　　　　　　　　)
　　　　　　　Wichita, Kansas 67202　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
SINCLAIR MASONRY, INC.,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　Serve:　Milo M. Unruh, Jr., Resident Agent　　)
　　　　　　　300 W. Douglas, Suite 330　　　　　　)
　　　　　　　Wichita, Kansas 67202　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
INTEGRATED PROPERTIES, LLC,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　Serve:　BD Registered Agent, Inc., Resident Agent　)
　　　　　　　301 N. Main, Suite 600　　　　　　　　)
　　　　　　　Wichita, Kansas 67202　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)

TIM L. SINCLAIR,                                              )
                                                             )
      Serve:  Tim Sinclair                                )
             1002 E. Waterview                          )
             Andover, Kansas 67202                      )
                                                             )
AND                                                          )
                                                             )
DAVID A. HAYNES,                                             )
                                                             )
      Serve:  David A. Haynes                             )
             1713 N. Timbercreek Drive                  )
             Mulvane, KS 67210                          )
                                                             )
                                                             )
                  Defendants.              )

## COMPLAINT

Plaintiff Philadelphia Indemnity Insurance Company, by and through counsel, respectfully submits this *Complaint* against Defendants Pal's Glass Service, Inc.; Blu Rock Concrete, LLC; Integrated Group Holdings, Inc.; Sinclair Masonry, Inc.; Integrated Properties, LLC; Tim L. Sinclair; and David A. Haynes.  In support, Philadelphia Indemnity Insurance Company states:

## PARTIES

1.     Plaintiff Philadelphia Indemnity Insurance Company (the "Surety"), is a Pennsylvania corporation authorized to do business in the State of Kansas.

2.     Defendant Pal's Glass Service, Inc. ("Pal's Glass"), is a Kansas corporation transacting business under the trade name "Pal's Glass" and may be served with process through its Resident Agent, BD Registered Agent, Inc., at 301 N. Main, Suite 600, Wichita, Kansas 67202.

3.     Defendant Blu Rock Concrete, LLC ("Blu Rock"), formerly Gorilla Concrete LLC, is a Kansas limited liability company that may be served with process through its Resident Agent, Tim Sinclair, at 301 N. St. Francis Street, Wichita, Kansas 67202.

4.      Defendant Integrated Group Holdings, Inc. ("Integrated Group Holdings"), is a Kansas corporation that from time to time transacts business under the trade name "Pal's Glass" and may be served with process through its Resident Agent, BD Registered Agent, Inc., at 301 N. Main, Suite 600, Wichita, Kansas 67202.

5.      Defendant Sinclair Masonry, Inc. ("Sinclair Masonry"), is a Kansas corporation that may be served with process through its Resident Agent, Milo M. Unruh, Jr., at 300 W. Douglas, Suite 330, Wichita, Kansas 67202.

6.      Defendant Integrated Properties, LLC ("Integrated Properties"), is a Kansas limited liability company that may be served with process through its Resident Agent, BD Registered Agent, Inc., at 301 N. Main, Suite 600, Wichita, Kansas 67202.

7.      Defendant Tim L. Sinclair is an individual and a Kansas resident that resides and may be served process at 1002 E. Waterview, Andover, Kansas 67202.

8.      Defendant David A. Haynes is an individual and a Kansas resident that resides and may be served process at 1713 N. Timbercreek Drive, Mulvane, Kansas 67210.

## STATEMENT OF JURISDICTION

9.      The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. § 1332.  The parties, including the respective members of each limited liability company defendant, are diverse and the amount in controversy exceeds $75,000.00, exclusive of interest and cost.

## VENUE

10.      Venue is proper in this district under 28 U.S.C. § 1391 in that (a) all defendants are domiciled, reside and/or maintain their principal place of business in the State of Kansas; and/or (b) a substantial part of the claims, allegations and events giving rise to this action occurred in the

State of Kansas; (c) the defendants are subject to personal jurisdiction in the State of Kansas at the commencement of this action; and (4) there is no district in which the action may otherwise be brought.

## **GENERAL ALLEGATIONS**

11.     Blu Rock operates in the concrete business and Integrated Group Holdings, which operates from time to time as Pal's Glass, and Pal's Glass itself, operate in the glass and glazing business.

12.     The Surety provided performance and payment bonds (the "Bonds") to Blu Rock, Integrated Group Holdings, Sinclair Masonry and Pal's Glass (collectively the "Bonded Principals").

13.     Pursuant to certain construction contracts, the Bonded Principals have current obligations to named obligees in the contracts (collectively these are the "Bonded Contracts").

14.     The Bonded Principals are in default on most if not all the Bonded Contracts.

15.     The Surety believes that the Bonded Principals have ceased operations or started new operations under a different operating structure.

16.     The Bonded Principals remain in possession of specific materials that were paid for by the owners of the projects that these Bonded Contracts relate (collectively the "Bonded Projects") and have failed or refused to hand over these materials to the Surety so that they may be used in the Bonded Contracts.

17.     The Bonded Principals may have control over remaining proceeds received from work performed on the Bonded Projects.

18.     Defendant Tim L. Sinclair ("Sinclair") owns and operates Pal's Glass, Integrated Group Holdings and Blu Rock.

19.     On October 30, 2017, in consideration of the Surety providing the Bonds, Sinclair executed a certain *General Indemnity Agreement* ("GIA"), signing on behalf of Pal's Glass Service, Inc., by Tim L. Sinclair, its President; Sinclair Masonry, Inc., by Tim L. Sinclair, its President; Integrated Group Holdings, Inc., by Tim L. Sinclair, its President; Integrated Properties, LLC, by Tim L. Sinclair, its Member; Gorilla Concrete, LLC (now Blu Rock); and himself individually (collectively the "Indemnitors").  A true and accurate copy of the GIA (with redaction) is attached hereto as **Exhibit A** and is incorporated herein by reference.

20.     David A. Haynes ("Haynes") also executed the GIA and serves as an indemnitor to the bonded obligations of the Bonded Principals (Haynes is hereafter referred to as part of the above-identified "Indemnitors").

## The Performance and Payment Bonds Issued by the Surety and the Contractual Obligations of the Bonded Principals to Certain Obligees

21.     The Surety provided certain payment and performance bonds to Blu Rock:

(1)     Bond No.: B00039500028; Obligee: Crossland Construction Company; Project: Aldi #80, Bolivar, MO; Bond Date: May 25, 2018; Penal Sum: $119,912.00;

(2)     Bond No.: B00039500030; Obligee: Crossland Construction Company; Project: Aldi #11, Freemont, NE; Bond Date: May 25, 2018; Penal Sum: $299,364.00;

(3)     Bond No.: B00039500011; Obligee: Crossland Construction Company; Project: MSSU Nixon Halls Subs Job 17M030 Contract 3A; Bond Date: January 22, 2018; Penal Sum: $657,250.00;

(4)     Bond No.: B00039500014; Obligee: Crossland Construction Company; Project: Aldi #75, Omaha, NE; Bond Date: February 12, 2018; Penal Sum: $105,001.00;

(5)     Bond No.: B00039500031; Obligee: Crossland Construction Company; Project: Wamego Aquatic Center; Bond Date: May 25, 2018; Penal Sum: $360,873.10;

(6)    Bond No.: B00039500032; Obligee: Crossland Construction Company; Project: Aldi #58, Independence, MO; Bond Date: June 1, 2018; Penal Sum: $106,778.00;

(7)    Bond No. B00039500033; Obligee: Crossland Construction Company; Project: Aldi #51, Overland Park; Bond Date: June 13, 2018; Penal Sum: $134,741.00;

(8)    Bond No.: B00039500034: Obligee: Crossland Construction Company; Project: Aldi #40, Bellevue, NE; Bond Date: June 27, 2018; Penal Sum: $104,900.00;

(9)    Bond No.: B00039500035; Obligee: Crossland Construction Company; Project: Pittsburg High School; Bond Date: June 27, 2018; Penal Sum: $426,442.00;

(10)    Bond No.: B00039500002; Obligee: Prosser Wilbert Construction; Project: Oakview Self Storage; Bond Date: November 15, 2017; Penal Sum: $476,000.00; and

(11)    Bond No.: B00039500037; Obligee: Crossland Construction Company; Project: Aldi #56, Excelsior Springs, MO; Bond Date: July 21, 2018; Penal Sum: $309,697.00.

22.    The Surety provided certain payment and performance bonds to Integrated Group Holdings:

(1)    Bond No.: B00039500017; Obligees: Crane Construction and Stillwater Public School; Project: Westwood Elementary; Bond Date: April 2, 2019; Penal Sum: $571,000.00.

23.    The Surety provided certain payment and performance bonds to Sinclair Masonry, Inc.:

(1)    Bond No.: B00039500036; Obligee: Atlas Construction Group, LLC; Project: Newkirk; Bond Date: July 11, 2018; Penal Sum: $508,600.00.

24.    The Surety provided certain payment and performance bonds to Pal's Glass:

(1)    Bond No.: B00039500021; Obligee: L. Keeley; Project: Excel Energy Canyon Ctr.; Bond Date: April 11, 2018; Penal Sum: $705,121.00;

(2)    Bond No.: B00039500005; Obligee: Key Construction Oklahoma; Project: AMC Building, 4909 E. 73rd, Tulsa, OK; Bond Date: November 13, 2017; Penal Sum: $242,000.00;

(3)     Bond No.: B00039500007; Obligee: Crossland Construction Company; Project: Mustang Educational Resource Center; Bond Date: December 6, 2017; Penal Sum: $256,200.00;

(4)     Bond No.: B00039500009; Obligee: Crossland Construction Company; Project: MSSU Nixon Hall - Subs; Bond Date: January 5, 2018; Penal Sum: $313,600.00;

(5)     Bond No.: B00039500016; Obligee: Crossland Construction Company; Project: Mustang Middle School; Bond Date: March 19, 2018; Penal Sum: $270,000.00;

(6)     Bond No.: B00039500022; Obligee: Crossland Construction Company; Project: Mustang HS Science Academy; Bond Date: April 24, 2018; Penal Sum: $118,000.00; and

(7)     Bond No.: B00039500025; Obligee: Flintco; Project: Independent School District #9 Union Public School; Bond Date: May 21, 2018; Penal Sum: $253,000.00.

### The Bonded Principals and the Indemnitors' Obligations Pursuant to the GIA

25.     The GIA makes the Indemnitors jointly and severally liable to the Surety for all payments made under the various payment bonds and all costs, damages, and monies paid or expended by the Surety in connection to its performance on the various performance bonds.

26.     Additionally, the GIA was made "for the purpose of collateralizing, exonerating, and indemnifying the Surety for any Bonds issued pursuant to this Agreement (the GIA)."

27.     More specifically, paragraph 3 of the GIA provides indemnity to the Surety, stating:

> INDEMNITY - Principals and Indemnitors agree to indemnify and hold harmless Surety from and against any Liability & Loss sustained or incurred: (a) by reason of having executed or being requested to execute any and all Bonds; (b) by failure of Principals or Indemnitors to perform or comply with any of the covenants or conditions of this Agreement or any other agreement; and (c) in enforcing any of the covenants or conditions of this Agreement or any other agreement. The Principals' and Indemnitors' obligations to indemnify the Surety shall also apply to any Bond renewals, continuations or substitutes therefore and shall extend to any payments made by Surety under the Good Faith belief that (a) Surety was or might

be liable therefor or (b) the payments were necessary or advisable to protect any of Surety's rights or to avoid or lessen Surety's liability or alleged liability. In the event of payments by Surety, Principals and Indemnitors agree to accept vouchers, a sworn itemization, or other evidence of such payments as prima facie evidence of the fact and extent of the liability of Principals and Indemnitors to Surety in any demand, claim or suit by Surety against Principals and Indemnitors. Separate suits may be brought under this Agreement as causes of action accrue, and the pendency or termination of any such suit shall not bar any subsequent action by Surety. The Surety may, but shall not be obligated to, join any or all of the Principals or Indemnitors as parties to any action relating to any Bonds or this Agreement, and Surety shall have no obligation to exhaust any remedies against any person or entity prior to pursuing any such action against one or more Principals or Indemnitors. All Principals and Indemnitors waive and subordinate all rights of indemnity, subrogation, and contribution against each other until all obligations due to the Surety under this Agreement, at law, or at equity have been fully satisfied. The Surety shall be entitled to intervene in any action between one or more Principals or Indemnitors in order to enforce this provision.

28.     Paragraph 4 requires Indemnitors to post collateral, stating:

POSTING OF COLLATERAL - **Principals and Indemnitors agree to deposit collateral immediately upon demand by Surety** an amount equaling any and/or all of the following: (a) the face amount of any claim or demand that is asserted against Surety under any Bond(s) plus the Surety's estimate of the costs and expenses Surety may sustain and incur while paying, compromising, resisting, defending, trying or appealing the claim or demand (in Surety's sole discretion); (b) sums posted by Surety as a reserve for the payment of potential losses and/or expenses; (c) all costs and expenses incurred in connection with investigating, paying or litigating any claim, and/or enforcing this Agreement, including but not limited to legal fees and expenses, professional and consulting fees, technical and expert witness fees and expenses; (d) all accrued and unpaid premiums owing to Surety for the issuance, continuation or renewal of any Bonds or for any policy of insurance issued by Surety for the Principal or Indemnitors; (e) funds loaned or advanced by Surety (at the Surety's sole discretion) to the Principal; and (f) all other amounts payable to Surety according to the terms and conditions of this Agreement or any other agreement between Surety and

Principals or Indemnitors. Surety may, in its sole discretion, either retain or use any part or all of the collateral in settlement or payment of any claim made under any Bond(s), as collateral or reimbursement for any actual Liability & Loss already incurred, as reserve to cover the amount of any potential Liability & Loss, or for any other purpose related to any Liability & Loss for which the Indemnitors would be required to collateralize, exonerate, or indemnify Surety under the terms of this Agreement. The Principals and Indemnitors shall be obligated to deposit the amount of collateral demanded by Surety regardless of whether they dispute their liability for any Liability & Loss or potential Liability & Loss or assert any defenses to the validity or enforcement of this Agreement. In the event that Surety demands collateral from more than one Principal or Indemnitor, Surety shall be entitled, in its sole discretion, to apportion the amount of collateral required to be deposited by each Principal or Indemnitor. If Surety permits the Principals and Indemnitors to deposit less than the full amount of either (a) through (f) herein, Surety may, from time to time, require the Principals and Indemnitors to increase the amount of the collateral by any amount Surety deems appropriate, in its sole discretion, up to an amount equal to (a) through (f) herein. In the event that the Principals and Indemnitors fail to deposit the amount of cash collateral required under this provision, Surety may, in its sole discretion, direct the Principals and Indemnitors to deposit alternate forms of collateral security acceptable to Surety. Principals and Indemnitors acknowledge that their duty to deposit collateral under this Paragraph is specifically enforceable because Surety lacks an adequate remedy at law and their failure to deposit collateral with Surety as required by this Paragraph will cause irreparable harm to as to justify injunctive relief compelling the deposit of collateral. Surety agrees to refund any unused portion of the deposit, without any interest or other damages for loss of use of such funds, upon the termination of all liability of Surety on all Bonds and the full performance of all of the Principals and Indemnitors of all obligations under this Agreement.

[Emphasis added].

29.     Paragraph 5 requires Indemnitors to assign certain rights under all Bonded

Contracts, stating:

ASSIGNMENTS - **In the event of a Default, Principals and Indemnitors do hereby assign, transfer and set over to Surety**, as of the date of execution of each Bond, all of their rights under all

Bonded Contract(s) including: (a) their right, title and interest in all subcontracts, purchase orders, and any surety bonds supporting such agreements, let in connection therewith; (b) **all machinery, plant, equipment, tools and materials which shall be upon the site of the work or elsewhere for use in connection with the Bonded Contract(s) including all materials ordered or fabricated for the Bonded Contract(s);** (c) all claims and causes of action against any parties to the Bonded Contract(s) or against third parties arising from or relating to the Bonded Contract(s); (d) any and all sums due, or to become due under the Bonded Contract(s), including all monies earned or unearned which are unpaid at the time of notice from Surety to the Obligee regarding such sums; (e) all rights it has in patents, patented processes, licenses, designs, copyrights, trademarks and all other intellectual property rights required for the performance of the work for which Surety has issued bonds, and expressly authorize Surety to use these property rights as required in Surety's discretion to complete the Bonded Contract(s); and (f) any other rights to payment from any person or entity in relation to the Bonded Contracts, including but not limited to, any insurance proceeds or premium refunds, any tax or assessment refunds, or any rights to payment by virtue of participation in a partnership, joint venture, or the like. In the event that the Surety receives any monies in excess of the total amount of its Liability & Loss or potential Liability & Loss on any individual Bond or Bonded Contract, Surety shall be entitled to apply any such excess amounts toward the Surety's Liability & Loss or potential Liability & Loss on any other Bonds or Bonded Contracts until the Surety has been fully reimbursed and collateralized as provided by the terms of this Agreement. In the event of Default, Principals and Indemnitors further hereby agree to appoint and designate Surety and its authorized representatives as their respective Attorneys-in-Fact with power to (i) endorse and sign in the name of Principals or Indemnitor, as payee or otherwise, all documents and all checks, drafts, warrants or other instruments made or issued in connection with the Bonded Contract(s); (ii) receive, collect and disburse the proceeds of all such checks, drafts or warrants; and (iii) direct the Obligee or project owner to deposit any further progress payments or other forms of payment in relation to a Bonded Contract to a specific bank account, or to make checks payable, jointly, to the Principal and the Surety or to the Principal and such laborers, materialmen, or others as may be indicated by the Surety; and (iv) execute any and all documents in connection with the Bonded Contract(s) consistent with the Surety's rights as assignee per the terms of this paragraph.

[Emphasis added].

30.     Paragraph 6 provides that the Surety shall have the right to file a UCC-1 giving the

Surety a security interest in its rights granted in the GIA.  This provision provides:

> FILING OF AGREEMENT UNDER THE UCC - This Agreement shall constitute a Security Agreement and grants to Surety a security interest in all assets, and also shall constitute a Financing Statement naming Surety as secured creditor and each Indemnitor as debtor, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect. The filing or recording of a copy of this Agreement shall be solely at the option of Surety and Surety's failure to do so shall not release or impair any obligation of Indemnitors, under this Agreement or otherwise arising, nor shall such failure be in any manner in derogation of Surety's rights under this Agreement or otherwise. Each Indemnitor hereby irrevocably appoints and designates Surety or its authorized representative as its respective Attorneys-in-Fact to sign any Financing Statement or any other form which may be required in order to file the same in any jurisdiction or office. A carbon, photographic or other reproduction of this Agreement may be filed as a Financing Statement.

31.     Paragraph 9 grants the Surety the exclusive right to decide and determine claims

made under the Bonds, providing:

> CLAIMS - Surety shall have the exclusive right, in its sole discretion, to decide and determine whether any claim, liability, suit or judgment made or brought against Surety on any Bond shall or shall not be paid, compromised, resisted, defended, tried or appealed, on the basis of Surety's Good Faith belief that it is or could be liable or because the Surety deems it necessary or expedient to do so, and Surety's decision thereon shall be final and binding upon the Indemnitors. Subject to the Surety's rights set forth in the first sentence of this section, which shall remain in full force and effect, if Principals or Indemnitors desire that the Surety litigate such claim or demand, or defend such suit, or appeal from such judgment, they shall, upon request: (a) provide a reasonable basis or bases for litigating such claim or demand, or defending such suit, or appealing from such judgment; and (b) deposit with the Surety cash or collateral satisfactory to the Surety in kind and amount to be used in paying any judgment or judgments rendered, or which might be rendered, against the Surety, together with interest, costs and attorneys' fees.

32.     Paragraph 21 makes all funds due or to become due under any of the Bonded

Contracts impressed with an express, constructive, and/or resulting trust.  The provision states:

> TRUST FUND - Principals and Indemnitors agree and expressly
> declare that all funds due or to become due under any Bonded
> Contract are impressed with an express, constructive, and/or
> resulting trust, whether in the possession of Principals or another
> and whether designated trust funds or not, for the benefit and
> payment of all persons to whom Principals incur obligations in the
> performance of such contract for which Surety would be liable under
> any Bond, which express, constructive, and/or resulting trust also
> inures to Surety's benefit… All funds due or to become due under
> any Bonded Contract, which constitute trust funds, shall be used for
> the sole purpose of performance or payment of obligation under the
> Bonded Contract for which Surety would be liable under its
> Bond(s), until that purpose has been fully satisfied…

33.     In the GIA, "Default" is defined in pertinent part, as any instance or condition

where one or more of the Bonded Principals and/or the Indemnitors have or are alleged to have:

(1) Forfeited, breached, abandoned, repudiated, or defaulted any Bonded Contract; (2) Neglected

or refused to pay for any indebtedness for labor, materials, or services used in the prosecution of a

Bonded Contract; (3) failed to honor any obligation under this Agreement; (4) Violated any other

written agreement with Surety, or (5) Failed to procure the discharge of Surety from any Bond

upon Surety's request.

**The Current and Expected Exposure of the Surety Under the Bonds**

34.     The Surety issued performance and payment bonds to the Bonded Principals in the

total penal sum of $7,872,414.10.

35.     In August and September 2018 Obligee L. Keeley issued Notices of Default to Blu

Rock and subsequently issued a Notice of Termination to Blu Rock on November 27, 2018. A true

and accurate copy of the Notice of Termination is attached hereto as **Exhibit B** and incorporated by reference.

36.     In September and October 2018, Prosser Wilbert Construction, Inc. sent multiple letters to Blu Rock informing it that it was in default of its Bonded Contract obligations. Prosser Wilbert made a claim to the Surety for Blu Rock's default on October 10, 2018. True and accurate copies of this correspondence is attached hereto as **Exhibit C** and incorporated by reference.

37.     On or about October 30, 2018, the Surety received notice that the Bonded Principals defaulted or were at a material risk to default on all the Bonded Contracts in connection to their work on the Bonded Projects.  True and accurate copies of the notices received by the Surety are attached hereto as **Exhibit D** and are incorporated herein by reference.

38.     These defaults include, but potentially are not limited to the following:

(1)     Crossland letter of default for Aldi #11 Freemont, NE project to Blu Rock;

(2)     Crossland letter of default for Aldi #40 Bellevue, NE project to Blu Rock;

(3)     Crossland letter of default for Aldi #56 Excelsior Springs, MO project to Blu Rock;

(4)     Crossland letter of default for Aldi #58 Independence, MO project to Blu Rock;

(5)     Crossland letter of default for Aldi #80 Bolivar, MO project to Blu Rock;

(6)     Crossland letter of default for MSSU Nixon Hall project to Blu Rock;

(7)     Crossland letter of default for Sutherland's Dodge City project to Blu Rock; and

(8)     Crossland letter of default for Pittsburg Middle School Gym project to Blu Rock.

39.     On or about November 15, 2018, the Surety received notice that its Bonded Principal had been declared in default by Obligee Crane Construction Company for failure to perform on the McKeever's Market project. Crane subsequently terminated Blu Rock from the project on December 7, 2018 for non-performance and failure to pay subs and suppliers. True and accurate copies of these letters are attached hereto as **Exhibit E** and incorporated by reference.

40.     On December 10, 2018, the Surety received notice that its bonded principals had declared their default of their contract duties to Nabholz Construction Corporation for the Stillwater Public Schools, Westwood Elementary Project, via a letter of termination from Nabholz Construction Corporation. A true and accurate copy of this letter is attached as **Exhibit F** and incorporated by reference herein.

41.     Concurrently, the Surety issued Letters of Direction to certain Obligees, which request that all remaining bonded contract funds from the Bonded Projects be paid to the Surety in furtherance of the Surety's performance and payment obligations.  True and accurate copies of the Letters of Direction are attached hereto as **Exhibit G** and are incorporated herein by reference.

42.     The Surety received notice on November 20, 2018, that the Bonded Principals had stopped their work and abandoned most of the Bonded Projects.  True and accurate copies of these letters are attached hereto as **Exhibit H** and are incorporated herein by reference.

43.     In the November 20, 2018 letters, the Obligee makes demand upon the Surety to address the Bonded Principals' default, including performance obligations that remain on the various Bonded Projects.

44.     The Surety calculates that it has exposure on the Bonds of approximately $4,500,000 and that its exposure is likely to increase.

**The Bonded Principals' Improper Retention of Raw and Finished Materials that are Being Used in the Fabrication and Performance of the Work on the Bonded Projects**

45.     The Bonded Principals are storing at their shop or elsewhere under their control certain raw and finished materials that the Bonded Principals use in the fabrication and performance of their work on the Bonded Projects.

46.     These materials were paid for by the owners on the various Bonded Projects.

47.     Upon information and belief, the Bonded Principals are holding these materials in trust for the specific use and incorporation into the Bonded Projects.

48.     Each of these materials are earmarked and specifically labeled or easily identified for use on specific bonded projects.

49.     The Bonded Principals refuse to voluntarily hand over the materials despite being obligated to do so and as a result they are causing the Surety to incur unnecessary increased costs because the Surety will be forced to re-order and fabricate the materials in furtherance of its obligation to complete certain bonded projects.

**The Bonded Principals' Improper Control Over Remaining Bonded Contract Proceeds**

50.     The Indemnitors had previously held out to the Surety in writing that certain materials for the Bonded Contracts were in its possession, including, at least $18,000.00 worth of materials for the Mustang Science Academy Project (Bond No. B00039500022).

51.     The Surety received notice that the Bonded Principals bank with Emprise Bank and KS StateBank.

52.     The Surety knows that bonded contract proceeds from the Bonded Projects get deposited in one or both banks.

53.     The deposit of bonded contract proceeds is easily identifiable and able to be traced.

54.     The Bonded Principals refuse to hand over or otherwise relinquish control of the remaining bonded contract proceeds despite being obligated to do so and as a result they are causing the Surety to incur unnecessary increased costs because the Surety will be forced to expend part of the penal sum remaining on the respective Bonds to pay payment bond claims and to complete performance obligations.

**The Surety's Demand that the Bonded Principals and the Indemnitors Post Collateral and the Bonded Principals and the Indemnitors' Refusal to Adhere to Their Obligations**

55.     On November 21, 2018, the Surety sent written demand to the Bonded Principals and the Indemnitors that each satisfies the obligation to immediately post $3,000,000 in collateral pursuant to the requirements on them from the GIA.  A true and accurate copy of the November 21, 2018 demand to post collateral is attached hereto as **Exhibit I** and is incorporated herein by reference.

56.     The Surety sent another written demand on January 18, 2019 to the Bonded Principals and Indemnitors that each satisfy the obligation to immediately post $4,500,000 in collateral pursuant to the GIA.  A true and accurate copy of this demand is attached hereto as **Exhibit J** and incorporated by reference.

57.     The Bonds were issued to the Bonded Principals in exchange for the agreement made by the Bonded Principals and the Indemnitors to indemnify and hold the Surety harmless from any loss incurred as a result of non-performance by the Bonded Principals.

58.     The Bonded Principals and the Indemnitors have refused to post any in collateral or otherwise protect the Surety from suffering irreparable harm, and as a result, are in default of their obligations under the GIA.

## COUNT I – SPECIFIC PERFORMANCE

59.     The Surety realleges and incorporates every allegation of the preceding paragraphs as though fully set forth below.

60.     Section 4 of the GIA requires that the Bonded Principals and the Indemnitors "agree to deposit collateral immediately upon demand by Surety an amount equaling any and/or all" of the loss the Surety estimates it may incur.

61.     The Surety sent two written demands to the Bonded Principals and the Indemnitors to immediately post $3,000,000 in collateral, and then to post $4,500,000 in collateral, but they refuse to adhere to their obligations to do so.

62.     The GIA is a contract entitling the Surety to specific performance of the obligations therein.

63.     The reason that specific performance is required is the Surety will suffer irreparable harm if collateral in the amount of $4,500,000 is not immediately posted because the Bonded Principals and/or the Indemnitors are likely to spend or otherwise allow the remaining bonded contract proceeds to dissipate, they are likely to dispose of the materials currently in their possession or control, and these actions dissipate total Indemnitor and Principal assets otherwise available to the Surety which may not otherwise be replaced.

64.     Specific performance maintains the benefit of the bargain agreed to by the Surety. In the GIA, the Principals and Indemnitors expressly acknowledge that their duty to deposit collateral is specifically enforceable because the Surety lacks and adequate remedy at law and their failure to deposit collateral with Surety will cause irreparable harm to the Surety.

65.     The conditions and requirements exist for this court to grant specific performance in the form of an order requiring the Bonded Principals and the Indemnitors to post $4,500,000 in

collateral and the Surety requests such relief in enforcement of the indemnitors' obligation under the GIA.

**WHEREFORE**, The Surety prays for judgment on Count I in its favor and against defendants Pal's Glass Service, Inc.; Blu Rock Concrete, LLC; Integrated Group Holdings, Inc.; Sinclair Masonry, Inc., Integrated Properties, LLC, Tim L. Sinclair and David A. Haynes, and each of them jointly and severally; that each are required and ordered to specifically perform the obligations set forth in the General Indemnity Agreement, including, but not limited to, immediately posting $4,500,000 in collateral; plus attorney's fees, expenses, and costs incurred; for the costs of this action; for consultants' costs and expenses; and for such further relief that the Court deems just and proper.

## COUNT II – REQUEST FOR PRELIMINARY INJUNCTION

66.     The Surety realleges and incorporates every allegation of the preceding paragraphs as though fully set forth below.

67.     The Surety seeks an order enjoining the Bonded Principals and the Indemnitors from spending or otherwise allowing the remaining bonded contract proceeds to dissipate until collateral in the amount of $4,500,000 is posted.

68.     The Surety also seeks an order enjoining the Bonded Principals and the Indemnitors from disposing of the materials currently in their possession or control.

69.     The order will preserve the benefit of the bargain between the Surety, the Bonded Principals and the Indemnitors as well as the status quo on the Bonded Projects and the order will prevent the Surety from suffering irreparable harm it otherwise would.

70.     Injunctive relief is warranted because the Surety has (1) a reasonable chance of success to prevail on the merits; (2) a substantial threat of irreparable harm to which there is no

adequate remedy at law; (3) a threatened injury whose severity outweighs the harm the relief would inflict on the Bonded Principals and the Indemnitors, if any; and (4) the right to such relief because it would not be a disservice to the public.

71.     The Surety meets these requirements because it has an enforceable GIA.  The Surety is entitled therein to indemnification, the receipt of the Bonded Contract funds and materials, and the use and receipt of collateral.

72.     The Surety has a substantial threat of irreparable harm because without the injunctive relief, the Surety will still have to perform under the Bonds while litigation ensues and time elapses but without assurance that the Bonded Principals and the Indemnitors are preserving bonded contract proceeds, materials, and assets.  Also, there is no assurance the Bonded Principals and the Indemnitors will not become insolvent.

73.     This injury to the Surety clearly outweighs the harm an injunction would inflict on the Bonded Principals and the Indemnitors in that both requested that the Bonds be issued, the Bonded Principals already received bonded contract proceeds, have been paid for materials which they have failed and refused to provide to the Obligees and surety for utilization in the Bonded Projects and the GIA was agreed to in consideration for the Bonds being issued.

74.     The GIA sets forth the promise of the Bonded Principals and the Indemnitors to post collateral.

75.     Additionally, the Surety has and will continue to suffer losses which resulted from the Bonded Principals' failure to perform.

76.     Post-judgment remedies are of little use to the Surety when it is required to expend money now in furtherance of the Bonded Principals' ongoing obligations under the Bonded Contracts.

77.     Finally, the public interest favors the enforcement of a bargained for agreement. Here, the GIA, is a favored mechanism to protect the Surety who guarantees the performance of these Bonded Contracts.

78.     Accordingly, the injunctive relief requested by the Surety is reasonable, necessary and warranted.  This relief protects the Surety, maintains the status quo, honors the bargained for deal between the Surety, the Bonded Principals and the Indemnitors, and ensures the Bonded Projects are completed.

**WHEREFORE**, The Surety prays for judgment on Count II in its favor and against defendants Pal's Glass Service, Inc.; Blu Rock Concrete, LLC; Integrated Group Holdings, Inc.; Sinclair Masonry, Inc., Integrated Properties, LLC, Tim L. Sinclair and David A. Haynes, and each of them jointly and severally; that each are enjoined in the following manner: (1) the Bonded Principals and the Indemnitors shall refrain and are precluded from spending or otherwise allowing the remaining bonded contract proceeds to dissipate until collateral in the amount of $4,500,000 is posted; and (2) the Bonded Principals and the Indemnitors shall refrain and are precluded from disposing of the materials currently in their possession or control and in turn shall hand over to the Surety all materials; plus attorney's fees, expenses, and costs incurred; for the costs of this action; for consultants' costs and expenses; and for such further relief that the Court deems just and proper.

## COUNT III – QUIA TIMET RELIEF[1]

---

[1] *Quia timet* is the right of a surety to demand that the principal place the surety "in funds" when there are reasonable grounds to believe that the surety will suffer a loss in the future because the principal is likely to default on its primary obligation to the creditor. *See New Orleans v. Gaines's Adm'r*, 131 U.S. 191, 212, 33 L. Ed. 99, 9 S. Ct. 745 (1889); *Morley Constr. Co. v. Maryland Casualty Co.*, 90 F.2d 976, 977-78 (8th Cir.), *cert. denied*, 302 U.S. 748, 58 S. Ct. 266, 82 L. Ed. 578 (1937). Exoneration, though closely related, is distinct. It is the surety's right, after the principal's debt has matured, to compel the principal to honor its obligation to the creditor. *See Filner v. Shapiro*, 633 F.2d 139, 142 (2d Cir. 1980); 74 Am Jur. 2d Suretyship § 174, at 122 (1974); Restatement of Security § 112 (1941). Historically, a bill *quia timet* was the procedural device by which a court of equity would exercise its jurisdiction "to protect a party against the occurrence of some future injury which he fears he may suffer, and which he cannot avoid

79.     The Surety realleges and incorporates every allegation of the preceding paragraphs as though fully set forth below.

80.     There are losses on the Bonded Contracts, additional claims currently being investigated and there is a likelihood of future claims on the Bonds by one or more obligee, subcontractor or supplier arising out of one or more of the Bonded Principals' defaults, including, but not limited to, their failure to complete performance of the Bonded Contract or pay outstanding invoices to subcontractors or suppliers.

81.     The Surety will continue to suffer future losses based on one or more Bonded Principal's default, non-performance and failure to pay.

82.     The Surety believes the total penal sum of the Bonds is at risk of being expended by the Surety to complete the Bonded Projects and pay bonded subcontractors and suppliers for labor and/or materials supplied to the Bonded Contracts.

83.     The Surety is obligated to pay these sums so long as valid claims are made under the Bonds.

84.     The Surety has paid losses and expects there will be additional valid claims made.

---

by a present action at law." Mann & Jennings, *Quia Timet: A Remedy for the Fearful Surety*, 20 Forum 685, 686 (1985); *see* 4 Pomeroy's Equity Jurisprudence §§ 1393-94, at 1021-22 (5th ed. 1941). *Quia timet* is the applicable remedy available to the surety before the principal's debt is mature when it becomes likely that the principal will default on his obligation; exoneration is the proper remedy once liability has matured and the principal has defaulted on his debt to the creditor. *Quia timet* and exoneration contain common substantive elements. Specifically, the surety must establish that the debt is presently due (exoneration) or will come due (*quia timet*), that the principal is or will be liable for the debt, and, that absent equitable relief, the surety will be prejudiced because it will be forced to advance the money to the creditor. *See Admiral Oriental Line v. United States*, 86 F.2d 201, 204 (2d Cir. 1936). In *Admiral Oriental*, Judge Learned Hand stated that "before paying the debt a surety may call upon the principal to exonerate him by discharging it; he is not obliged to make inroads into his own resources *when the loss must in the end fall upon the principal." Id.* (emphasis added); *see Filner*, 633 F.2d at 142 ("the existence of the principal's duty to pay gives a surety the equitable right to call upon the principal to exonerate him from liability by discharging the debt when it becomes due").

85.     These expected losses are not speculative and are recoverable now by the Surety "in advance" of all actual losses occurring.

86.     The purpose of this remedy is to assist the Surety in fulfilling its obligation to complete the Bonded Projects and pay valid claims made by bonded subcontractors and suppliers.

87.     The Surety has and is expected to continue to incur legal fees, expenses and costs as a direct result of fulfilling its obligation to complete the Bonded Projects and pay claims made by bonded subcontractors and suppliers.

88.     The Surety is expected to incur consultants' expenses and costs that are incurred in the investigation and evaluation of the claims made on the Bonded Projects.

**WHEREFORE**, The Surety prays for judgment on Count III in its favor and against Pal's Glass Service, Inc.; Integrated Group Holdings, Inc.; and Blu Rock Concrete, LLC; jointly and severally, in an amount in excess of $4,500,000; plus attorney's fees, expenses, and costs incurred; for the costs of this action; for consultants' costs and expenses; and for such further relief that the Court deems just and proper.

Respectfully submitted,

**LEVY CRAIG LAW FIRM**
A PROFESSIONAL CORPORATION

By ____*/s/ Jason S. Leiker*_____
        Jason S. Leiker          KS #20675
        James A. Breckenridge        KS #27131
        4520 Main Street, Suite 1600
        Kansas City, Missouri 64111
        (816) 474-8181
        Fax: 816/382-6606
        jleiker@levycraig.com
        jbreckenridge@levycraig.com
        *Attorneys for Plaintiff*